**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| KRISTOFER LOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:12-CV-96-TLS |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment [ECF No. 28], filed

by the Defendant, Norfolk Southern Railway Company, on November 18, 2013. The Defendant

filed a Brief in Support [ECF No. 29] that same day. The Plaintiff filed a Response [ECF No. 32]

on January 8, 2014. The Defendant filed a Reply [ECF No. 35] on February 10, 2014. On

February 10, 2014, the Defendant also filed a Motion to Exclude Opinions of Colon R. Fulk

Based on University of Michigan Ergonomics Study [ECF No. 36]. The Plaintiff filed a

Response [ECF No. 37] on February 19, 2014. The Defendant filed a Reply [ECF No. 38] on

February 22, 2014. On December 11, 2014, the Court issued an Order [ECF No. 42] finding that

the Plaintiff did not have a clear understanding of the scope of the Defendant's Motion for

Summary Judgment and should have an opportunity to respond to the Defendant's arguments

and evidence raised in the reply brief. Therefore, the Court directed the parties to file

supplemental briefing. The Plaintiff filed a Surreply [ECF No. 44] on January 9, 2015, and the

Defendant filed a Response [ECF No. 45] on January 23, 2015. The motions are ripe for ruling.

# STATEMENT OF FACTS

Unless otherwise noted, the following material facts are undisputed. The Plaintiff began working for the Defendant in December 2003 and was promoted to conductor in May 2004. On March 21, 2009, the Plaintiff was working as a conductor/trainman in the Defendant's Elkhart (Indiana) Yard when he suffered an injury that is the basis of this litigation. The Plaintiff was part of the crew working the YBES15 assignment, which involved pulling cars from the west end of the classification tracks in the hump yard to the departure tracks for westbound trains. In particular, the Plaintiff's job was to couple rail cars as necessary in the classification tracks in preparation for the engineer to pull the cars to the departure tracks.

The classification yard, also known as the "hump yard" or the "bowl," is a bowl-shaped yard with numerous tracks whereby individual rail cars can be placed, or "humped," into the appropriate tracks in preparation for departure to their ultimate destination. A locomotive pulls a cut of cars up a lead track on a hill, or "hump," at the east end of the yard. At the crest of the hill rail cars are manually uncoupled, allowing the car to roll down grade, controlled by a computer-operated system of hydraulic, pneumatic, and mechanical retarders and switches into various classification tracks on the west end of the yard. To release a rail car at the crest of the hump, an employee pulls a pin to unlock and open the knuckle on the front (west) end of the trailing car, allowing the lead car to separate and roll downhill into the yard. Thus, as a car is rolling down grade into the classification tracks, the lead knuckle on the front of the car is open and the trailing knuckle on the rear of the car is closed. Generally, cars humped into the classification tracks will automatically couple to the cars already in the tracks, as the open knuckle on the front end of the car entering the tracks engages the closed knuckle of the car already in the track.

The knuckle portion of the coupler on each end of a rail car extends out from the car by way of a drawbar, which can vary in length depending upon the overall length of the car. The drawbar is designed to pivot in its housing, allowing the knuckle end some lateral play to prevent moving cars from derailing on a curved track. A consequence of this lateral movement is that drawbars can become slewed or misaligned and pass by each other, thereby preventing cars from coupling. When this occurs, railroad employees must manually realign the drawbars so that the knuckle ends will engage each other and couple the rail cars.

Sometime between 10:00 AM and noon on March 21, 2009, the Plaintiff was walking along track 57 checking to ensure that all the cars were properly coupled when he came upon two cars that were butted up against each other and that had bypassed drawbars. The knuckles on both drawbars were closed. The Plaintiff radioed the engineer who then pulled the cars on the east end of the track back one-car length. Once three-step protection was enabled, a safety procedure to ensure the train does not move while an employee is between cars, the Plaintiff went between the cars to realign the drawbars in preparation for coupling. Starting with the car attached to the cut of cars in the classification track, the Plaintiff realigned the drawbar by placing his back against the drawbar, bending his knees with his hands behind him, grabbing the bottom of the drawbar, and stepping it back as he was trained. The Plaintiff then used the same procedure to realign the second drawbar on the car attached to the locomotive. Although the Plaintiff successfully realigned the second drawbar, he felt a pop and injured his back at the moment the second drawbar was placed in the proper position. With each drawbar, the Plaintiff opened the knuckle after realigning it to the proper position for coupling. After adjusting the drawbars and opening the knuckles, the Plaintiff radioed the engineer to bring the cars back

together. Upon doing so, the cars coupled without any problem and the engineer pulled the train out of track 57.

After the injury, the Plaintiff experienced tingling and soreness in his back. He reported the injury two days later, on March 23, 2009.

## DISCUSSION

### A.    Motion to Exclude

In response to the Defendant's summary judgment motion, the Plaintiff offers the report of Mr. Colon R. Fulk of Railex, Inc., a railroad operations consulting firm. Mr. Fulk's report quotes extensively from a University of Michigan ergonomics study, and the Defendant asks the Court to exclude the opinions of Mr. Fulk, the Plaintiff's expert, arguing that he is a train operations expert, not an ergonomics and biomechanics expert, and that his opinions based upon the ergonomics study are inadmissible pursuant to Federal Rules of Evidence 702 and 703.

### *1.    Timeliness*

As a preliminary matter, the Plaintiff asserts that the Defendant's motion to exclude the opinions of Mr. Fulk is untimely, but presents no argument or authority in support of this position. The Defendant argues that no deadline for objecting to expert testimony was set in this case, and that it could not have raised an objection to Mr. Fulk's opinion until the Plaintiff designated the opinion as evidence in opposition to the motion for summary judgment.

Rule 26 sets deadlines for the disclosure of expert testimony, Fed. R. Civ. P. 26(a)(2)(D) (requiring disclosure at least 90 days before the date set for trial, absent a stipulation or court order), and for pretrial disclosures, Fed. R. Civ. P. 26(a)(3)(B) (requiring disclosure at least 30

days before trial, unless the court orders otherwise, of witness lists, depositions, and identification of exhibits). Rule 26(a)(3)(B) further provides that objections to pretrial disclosures are due within 14 days unless the Court sets a different time. However, these deadlines relate to disclosure and not to the time period by which a party must file a motion to strike or exclude expert testimony. Pursuant to Local Rule 56-1(e), the Defendant filed a separate motion regarding the admissibility of Mr. Fulk's opinion.

The Court finds that the Plaintiff's argument that the motion in untimely is without merit. The Defendant filed its motion to exclude arguing that Mr. Fulk's opinion is inadmissible the same day it filed its timely reply to the Plaintiff's response in opposition of summary judgment, in which the Plaintiff designated Mr. Fulk's opinion into evidence. The Court finds, and the Plaintiff presents, no basis for which the motion to exclude could be considered untimely. For the purposes of summary judgment, the Court finds that the Defendant's motion disputing the admissibility of Mr. Fulk's opinions is timely.

### 2. Rule 702 and Daubert Standard

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable

principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting Fed. R. Evid. 702). In evaluating whether an expert's proposed testimony meets the *Daubert* standard, the Court is to "scrutinize the proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire*, 526 U.S. at 152). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("[W]e 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified."); Fed. R. Evid. 702 advisory committee note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

District courts apply the *Daubert* framework described above using a three-part analysis. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). First, the Court must determine whether the proposed witness is qualified as an expert by knowledge, skill, experience, training, or education. If so, the Court must then decide whether the reasoning or methodology underlying the expert's testimony is reliable. If these two requirements are met, the Court must assess

whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or to determine a factual issue. *See id.* at 644 (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

"Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." *Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1085 n.32 (7th Cir. 1981). The Defendant will have the opportunity to expose those weaknesses at trial and, as the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 3.     *Analysis*

The Defendant argues that the opinions of Mr. Fulk are inadmissible because they are formed on the basis of the University of Michigan ergonomics study. The Defendant contends that Mr. Fulk is a train operations expert, who has no education or training in ergonomics or biomechanics, yet purports to rely on the ergonomics study to form the basis of his opinions concerning the ergonomic forces involved in adjusting a drawbar. The Defendant argues that Mr. Fulk is attempting to use his position as an expert witness to express a conclusion drawn from the statements of others, in effect serving as a spokesman for the ergonomics study, and is thereby serving as a vehicle for circumventing the rules of evidence. *See United States v. Lundy*, 809 F.2d 392, 396 (7th Cir. 1987) ("District courts must ensure that expert opinion testimony is in fact expert opinion, not merely opinion given by an expert."); *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) ("[T]he judge must make sure that the expert isn't being used as a

vehicle for circumventing the rules of evidence."). The Defendant argues that because Mr. Fulk is not qualified as an expert in ergonomics and biomechanics, he also is not able to attest to the reasoning and methodology underlying the data gathered and conclusions of the ergonomics study. In particular, the Defendant asks the Court to exclude "Mr. Fulk's opinions that drawbar adjustment is ergonomically too difficult for a single worker to undertake and that NS should have taken a pro-active stance and prohibited their employees from adjusting coupler/drawbars when working alone." (Mot. to Exclude 4, ECF No. 36.)

The Plaintiff argues that Mr. Fulk's 33 years of railroad experience, not the University of Michigan study, provides the basis for his opinion. He asserts that the study corroborates Mr. Fulk's experience and opinions and that Mr. Fulk is required, pursuant to Rule 26, to include any exhibit or data he considered in forming his opinion. The Plaintiff contends the study supports Mr. Fulk's opinions and is, therefore, properly cited.

The Plaintiff bears the burden of establishing the admissibility of his expert witness. The parties agree that Mr. Fulk is an expert in railroad operations and the record reflects his experience and credentials in the railroad industry, which includes the investigation of accidents. The Plaintiff asserts that Mr. Fulk's 33 years of railroad experience forms the basis of his opinions, but he does not show how that railroad experience gives him any special knowledge to qualify as an expert in the field of ergonomics or biomechanics, or to speak about the scientific measurements and forces necessary to move a drawbar. To the extent that Mr. Fulk gratuitously cites and quotes portions of the Michigan study discussing various scientific measurements and analysis, including the "necessary coefficient of friction," the "direction of the force vector," the "force magnitudes," and the like, as they relate to moving a drawbar, it does not appear that Mr. Fulk's expertise would include those scientific measurements or analysis. However, although

Mr. Fulk quotes the study's scientific discussion and states that he agrees with it, it does not appear that he is adopting those scientific measurements as his own. Rather, Mr. Fulk appears to use the study to bolster his own opinion about the challenges of moving a drawbar. *See* Fulk Report 4, ECF No. 37-1 ("In support of this opinion note the following study . . . .").

Mr. Fulk's report contains two quotes from the Michigan study. The first is a lengthy quote comprising what appears to be all of parts 3.0, 3.1, 3.2, and the first paragraph of part 4.0 of the Michigan study. The second quote, "When possible, the workers will team up to make the adjustment," Fulk Report 6, ECF No. 37-1, is difficult to place into context without the full report. Presumably, the "adjustment" referred to relates to drawbar adjustment, but the quoted portions of the Michigan study demonstrate that the study addressed not only railroad workers' injuries related to adjusting long drawbars but also to operating poorly maintained switch stands. *See id.* Without a proper citation or way to put the quote into context with drawbars, the Court cannot determine its admissibility. However, Mr. Fulk's gratuitous quotations of the Michigan study are of little effect. For the purposes of summary judgment, Mr. Fulk's own experience and observations, notwithstanding the data and quotations from the Michigan study, provide a sufficient basis to form an opinion as to whether it is better to have two workers on an assignment that would include drawbar adjustment.

To the extent that the Plaintiff believes that the Michigan study, or portions thereof, is admissible at trial is an issue the Court can determine at a later time after the record has been further developed. That Mr. Fulk reviewed the Michigan study does not automatically allow it to come in as evidence. An expert cannot bootstrap into evidence all the material that he relied on in forming his opinion. Those materials could potentially be brought into evidence, but whether the Michigan study is admissible at trial is a separate analysis to be taken up at the appropriate

time upon a more complete record. For the purposes of summary judgment, the Court does not need to decide that issue. Mr. Fulk's credentials and experience in the railroad industry provides sufficient basis for his opinion that moving a drawbar is better accomplished by more than one individual, even without the force measurement analysis cited in the Michigan study.

For the foregoing reasons, the Court will grant in part and deny in part the Defendant's Motion to Exclude the opinions of Mr. Fulk. The Court will grant the Defendant's request on the narrow basis that, to the extent Mr. Fulk refers to the scientific measurements and analysis of the Michigan study, the current record does not show that Mr. Fulk is a qualified expert as to those opinions. However, the Court finds that the rest of Mr. Fulk's opinion is appropriate and within the scope of his expertise. That Mr. Fulk quotes the Michigan study and agrees with it is not a basis for excluding testimony he is otherwise qualified to give. His own observations and experience are sufficient to form an expert opinion that it is safer for two individuals to work together to adjust a drawbar.

## B.        Motion for Summary Judgment

### 1.        Standard of Review

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must be able to show that a reasonable jury could return a verdict in her favor; if she is unable to "establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), summary judgment must be granted. A bare contention that an issue of fact exists is insufficient to create a factual dispute, but the court must

construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## 2. *Federal Safety Appliance Act*

The Federal Safety Appliance Act (FSAA) provides that railroad carriers may only use vehicles, locomotives, and trains equipped with certain safety appliances. 49 U.S.C. § 20302. The FSAA does not create an independent cause of action; employees who allege employers have violated the FSAA may sue under Federal Employers' Liability Act (FELA). *Lisek v. Norfolk & W. R.R. Co.*, 30 F.3d 823, 825–26 (7th Cir. 1994). However, the FSAA imposes an absolute duty on employers. *Id*. at 826. Plaintiffs attempting to prove an FSAA violation only have to show that the statute was violated in order to recover; no showing of negligence is required. *Id*. Here, the Plaintiff alleges that the Defendant violated the FSAA provision that permits a railroad to use rail cars on its lines only if they are equipped with "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the [cars]." 49 U.S.C. § 20302(a)(1)(A).

A plaintiff can establish the railroad's liability for an accident involving a coupling mechanism by either (1) providing evidence that the two cars failed to couple automatically upon

impact or (2) showing a defect in the coupling equipment. *DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 683 (7th Cir. 1995). Here, the Plaintiff relies solely upon the first method and argues that the rail cars' failure to couple is an automatic violation of the FSSA. Resp. 14 (citing *Lisek*, 30 F.3d at 829 ("[T]he Act requires automatic coupling equipment and the failure to couple creates the nearly irrebuttable presumption that the Act has been violated."). However, a railroad "cannot be held liable when it utilizes equipment that complies with the statutory mandate and thus couples automatically upon impact and is not defective." *DeBiasio*, 52 F.3d at 684 (citations and brackets omitted). The Supreme Court has recognized that "certain preliminary steps, such as ensuring that the knuckle is open, are necessary to proper performance of the coupler and that a failure to couple will not constitute an [F]SAA violation if the railroad can show that the coupler had not been placed in a position to automatically couple." *Norfolk & So. Ry. Co. v. Hiles*, 516 U.S. 400, 410 (1996). The "restriction on failure-to-perform liability logically extends to every step necessary to prepare a nondefective coupler for coupling . . . including ensuring proper alignment of the drawbar." *Id.* Thus, a railroad may avoid liability if it properly proves that the couplers were not properly set for coupling.

The Defendant contends that there is no evidence in this case that it violated the FSAA. It argues that slewed drawbars are commonplace in the railroad industry and that as a matter of law, misaligned drawbars are not malfunctioning drawbars. According to the Defendant, it is undisputed that a misaligned drawbar was the cause of the failure to couple, meaning that the failure of the two cars to couple cannot be a FSSA violation because the coupler "had not been placed in a position to automatically couple." *Hiles*, 516 U.S. at 410.

The Plaintiff argues that the Defendant has not offered any evidence showing that the couplers were not properly set, and that the impact of the cars without coupling is a violation of

the FSAA sufficient to survive summary judgment and proceed to trial. The Plaintiff disputes misalignment of a drawbar as the cause of the failure to couple, arguing that the evidence shows that the drawbars were not misaligned. The Defendant, however, argues that the evidence reveals that a misaligned drawbar is the only explanation for the failed coupling.

The parties agree on the nature and position of the cars at both the top of the hill when humped and in the classification yard when the Plaintiff discovered the uncoupled cars. The heart of the issue is what these facts mean in terms of what happened while the car traveled downgrade from the hump into the classification yard. The parties agree that when the car was humped into the yard, it began to roll down initially straight track with the leading knuckle open and a straight, aligned drawbar. The parties also agree that when the Plaintiff discovered the uncoupled cars, they were butted up against each other, with bypassed drawbars and both knuckles closed. The parties disagree on the interpretation of these facts; namely, what the nature and position of the uncoupled cars as discovered by the Plaintiff proves happened as the car was humped into the yard.

The Defendant contends that there is only one possible cause for the failure of the cars to couple; that as the cars traveled down the track into the yard the drawbars became misaligned, proving that they were not properly set for coupling and, therefore, that the Defendant cannot be held liable under the statute. Although the drawbars were bypassed when discovered, the Plaintiff argues that the fact that both knuckles were closed proves that the drawbars were aligned at the moment of impact, thus were properly set for automatic coupling, and that the failed coupling is what then caused the front knuckle on the humped car to close and the drawbars to bypass and become misaligned. The Plaintiff contends that if the drawbars had become misaligned before impact, the knuckles could not have made contact with each other,

meaning that the front knuckle on the humped car would have still been open when he discovered it. The only way for the knuckle to close is if it had made contact with the other knuckle, and the only way it could have made contact with the other knuckle is if the drawbars were aligned. Further, the Plaintiff contends that there is no reason for the drawbars to become misaligned before the failed coupling because they are cut off on straight track and there is no evidence of any other failed couplings, suggesting that the drawbars on no other cars that followed the same track became misaligned.

The Defendant argues that the closed knuckle proves the opposite, that the drawbars were misaligned prior to the coupling attempt. The Defendant argues that only two reasons can explain the closed front knuckle, either the knuckle closed when it butted up against the body of the other car or it closed when it made contact with the other car's knuckle as the slightly-slewed drawbars bypassed, meaning that the knuckles could still make enough contact to close the front knuckle even though the drawbars were misaligned to a degree sufficient to prevent coupling. In either situation, the Defendant contends, the drawbars had to have been sufficiently misaligned to prevent automatic coupling because if they had been aligned they would have coupled, as they did without difficulty after the Plaintiff had realigned both drawbars.

The Defendant argues that there are many reasons for which the drawbars may have become misaligned. First, although initially cut off on straight track, the humped car had to go through numerous curves, switches, and retarders on its way to track 57 whereby inertia and vibration could have caused the drawbar to slew and become misaligned. Second, the Plaintiff's description of the car at issue must have been a TBOX car, which has a significantly longer drawbar than other cars and thus is more susceptible to movement by inertia. Finally, the rear drawbar on a humped car can become misaligned as a result of the impact when the car couples

to the next car in the classification track, causing it to be out of alignment to receive the next car. In each situation, the drawbar on the humped car, the previously humped car now waiting in the classification track, or both, can become misaligned to the degree that they are no longer properly set for automatic coupling. The Defendant argues that it has met its burden and properly proven that the couplers were not properly set for coupling because the only possible explanation for the result is that the drawbars were misaligned.

The Court finds that there is a genuine dispute as to material facts that a jury must determine after hearing and considering the evidence. Although the parties agree on the facts surrounding the nature and position of the cars both when initially humped and when discovered by the Plaintiff, they disagree on what conclusions are properly drawn from these facts. For example, each side argues that the closed knuckle on the humped car proves either alignment or misalignment of the drawbar before the coupling attempt, and the Court must avoid "the temptation to decide which party's version of the facts is more likely true." *Payne*, 337 F.3d at 770 (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The evidence in this case is not so one-sided or conclusive to resolve this issue at the summary judgment stage, where the Court must construe all facts in a light most favorable to the nonmoving party and view all reasonable inferences in that party's favor. *Bellaver*, 200 F.3d at 491–92. At this juncture of the case, there is a genuine dispute as to material facts regarding causation, including whether the drawbars misaligned at the moment of impact or not, or, stated differently, were the drawbars misaligned before the failed coupling attempt?

If the drawbars were misaligned before the coupling attempt, meaning that the couplers were not in a position to automatically couple, arguably the failure to couple would not constitute

a FSAA violation. *Hiles*, 516 U.S. at 410. Thus, a jury determination of this factual issue will be pivotal in establishing whether the Defendant is liable for the Plaintiff's injury.

For these reasons, the Defendant's motion for summary judgment on the FSAA claim is denied.


### 3. FELA

The Plaintiff alleges that the Defendant violated 45 U.S.C. § 51. The statute provides in relevant part:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

A plaintiff suing under Federal Employers' Liability Act (FELA) must prove the common law elements of negligence: duty, breach, foreseeability, and causation. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998); *Fulk v. Ill. Cent. R.R. Co.*, 22 F.3d 120, 124 (7th Cir. 1994).

The FELA imposes upon railroads a general duty to provide their employees with a safe place to work. *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 741 (7th Cir. 2005). Although "a plaintiff's burden when suing under the FELA is significantly lighter than in an ordinary negligence case . . . [t]he FELA does not, however, render a railroad an insurer of its employees." *Id.* at 741–42. The lighter burden of proof allows a plaintiff to more easily survive a motion for summary judgment, but he must still proffer some evidence of the defendant's negligence to survive summary judgment. *Id.* at 742 (citing *Lisek*, 30 F.3d at 832). In particular,

"[t]o establish that a railroad breached its duty to provide a safe workplace, the plaintiff must show circumstances which a reasonable person would foresee as creating a potential for harm." *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 300 (7th Cir.1996). To establish such foreseeability, a plaintiff must show that the employer had actual or constructive notice of those harmful circumstances. *Williams*, 161 F.3d at 1063 ("[A] FELA plaintiff injured by a defective condition cannot recover damages without showing that the employer had actual or constructive notice of the condition.").

The Plaintiff argues that the Defendant breached its duty to provide a safe work place by requiring him to realign drawbars without the benefit of a drawbar strap or the assistance of another coworker. The Plaintiff also argues that the facts of this case warrant an inference of negligence under the doctrine of *res ipsa loquitur*.

a.    *Negligence*

The Plaintiff contends that the Elkhart yard has a history of failed couplings due to defects in the computer humping system and track defects. The Plaintiff argues that the Defendant knew of the prevalence of the failed couplings, requiring employees to realign drawbars. The Plaintiff contends that the Defendant knew or should have known of the hazard of assigning a single employee to realign drawbars without the assistance of tools, such as a drawbar strap, or a colleague, and thereby failed to provide the Plaintiff with a reasonably safe place to work.

The Defendant argues that it is entitled to summary judgment on the Plaintiff's FELA claim because "the Plaintiff doest not have a scintilla of evidence that NS was negligent." Reply 13, ECF No. 35. In support of his claim, the Plaintiff offers the reports of two experts to argue

that there is a history of failed couplings at the Elkhart yard, which required the Plaintiff to realign slewed drawbars for coupling, a hazardous process. The Plaintiff claims that the Defendant's policy only allowed employees in the Cars Department the benefit of a drawbar strap, a strap attached to each drawbar that pulls them into alignment as a locomotive pulls the cars apart, to realign drawbars. Thus, the requirement to realign drawbars without a drawbar strap and without the aid of another coworker placed him in an unsafe place to work.

As previously discussed, the Defendant challenges whether one of the Plaintiff's experts, Colon Fulk, is qualified to render an opinion that drawbar adjustment is too difficult for a single worker to safely undertake alone and that the Defendant should have prohibited its employees from doing so. However, as noted above, the Court finds that Mr. Fulk's credentials and experience in the railroad industry provides sufficient basis for his opinion that moving a drawbar is better accomplished by more than one individual, even without the force measurement analysis cited in the Michigan study.

The Plaintiff has offered some evidence of the prevalence of failed couplings, requiring drawbar adjustment, as well as evidence that the Defendant knew or should have known of the hazards for an employee to undertake this task alone. Considering the lighter burden of proof for plaintiffs in FELA cases and that all facts are construed in a light most favorable to the nonmoving party at summary judgment, as well as all reasonable inferences viewed in that party's favor, the Court finds that the Plaintiff has provided evidence by which a jury could find that that the Defendant was negligent. *See Holbrook*, 414 F.3d at 742 (noting that a railroad will be held liable if employer negligence played any part, even the slightest, in producing the injury.) For these reasons, the Defendant's motion for summary judgment on the FELA claim is denied.

*Res ipsa loquitur*

The Supreme Court has held that the doctrine of *res ipsa loquitur* is applicable to FELA cases and permits an inference of negligence. *Robinson v. Burlington N. R.R. Co.*, 131 F.3d 648, 652 (7th Cir. 1997) (citing *Jesionowski v. Bos. & Me. R.R.*, 329 U.S. 452 (1947)). *Res ipsa loquitur* is appropriately applied when (1) the injury is of a kind that does not usually occur in the absence of negligence, (2) the instrument that caused the injury is in the exclusive control of the defendant, and (3) the plaintiff is not at fault in causing the injury. *Id.* The Supreme Court has held that a jury can use the doctrine of *res ipsa loquitur* to infer negligent behavior in FELA claims after it finds the plaintiff's conduct did not contribute to the accident. *Robinson*, 131 F.3d at 653–54.

The Seventh Circuit has applied the doctrine of *res ipsa loquitur* in certain situations. The Court has specifically noted that

> [u]nderlying the rule is the tenet that certain accidents are so unusual that the party shown to be in exclusive control of the injuring object ought to be held responsible unless that party can offer a reasonable explanation. The rule relieves a plaintiff who, for example, opens a new tin of chewing tobacco and finds inside a human toe, from having to show exactly what act was responsible for the toe's inclusion in his tobacco."

*Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 579 (1994) (citing *Pillars v. R.J. Reynolds Tobacco Co.*, 117 Miss. 490 (1918)). The Court in *Jesionowski* noted that "[d]erailments are extraordinary, not usual, happenings." 329 U.S. at 458. Ultimately, the first element of the doctrine requires the Court to determine whether the Plaintiff has presented evidence to show that the incident at issue is of the type that does not usually occur in the absence of the Defendant's negligence. Notably, while the doctrine of *res ipsa loquitur* can certainly apply in FELA cases, it "does not apply in the case of an ordinary accident that could have occurred absent some negligence by the defendant." *Smith v. CSX Transp.*, 1:04CV1501DFHTAB, 2006

WL 231494, at *5 n.2 (S.D. Ind. Jan. 31, 2006) (citing *Robinson*, 131 F.3d at 652–55). Finally, the Supreme Court has made clear that the FELA statute does not make a railroad into a worker's insurer and that the basis of liability is the railroad's negligence, not the mere fact that injuries occurred. *Robinson*, 131 F.3d at 651–52.

The Plaintiff's injury did not occur as a result of some extraordinary event. He was straightening a misaligned drawbar by stepping it back as he was trained when he says he injured his back. The Supreme Court has noted that "misaligned drawbars [a]re an inevitable byproduct of the ability to traverse curved track and . . . are part of the normal course of railroad car operations." *Hiles*, 516 U.S. at 412 (holding that a misaligned drawbar is not, as a matter of law, a malfunctioning drawbar and is not a violation of § 2 of the SAA). The incident at issue is not of the type that does not usually occur in the absence of the Defendant's negligence. This was an ordinary accident stemming from the ordinary occurrence whereby railroad employees realign drawbars that have been misaligned through the normal course of railroad operations—not the extraordinary event, such as a derailment, that are of the type of accidents that *res ispa loquitur* is meant to cover.

Citing to *Jesionowski*, the Plaintiff argues that negligence can be inferred under the doctrine of *res ipsa loquitur* because "the failure of the hump computer to properly couple the railcars, in the normal course of performing work at the Elkhart Classification Yard, would not have occurred but for the lack of proper care." Resp. 17–18. However, the hump computer does not itself couple cars, but rather calculates the distance a humped car must travel to reach the next car in its intended track and uses a system of retarders to control the car's speed to allow it to reach and couple to the next car. Because misaligned drawbars are part of the normal course of railroad operations, it is possible for the Defendant to exercise proper care of a hump computer,

which operates correctly and delivers the humped car at the proper speed, yet still experience a failed coupling because the drawbars are misaligned.

For these reasons, the Court finds that, based on the factual record developed to date in this case, the doctrine of *res ipsa loquitur* does not appear to apply. However, given the Court's previous discussion, the issue has been effectively rendered moot at this summary judgment point of the case.

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Exclude [ECF No. 36] is GRANTED IN PART and DENIED IN PART. The Defendant's Motion for Summary Judgment [ECF No. 28] is DENIED.

SO ORDERED on June 10, 2015.

  s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION